CONTINENTAL TRUST CO. et al. v.
BROWN et al.   (Nos. 5553, 5586.)

(Court of Civil Appeals of Texas.   San Antonio.
Oct. 21, 1915.   Rehearing Denied
Nov. 17, 1915.)

1. RECEIVERS 69—TITLE TO PROPERTY—RIGHT ACQUIRED BY RECEIVER.

Where a contract for the purchase of railroad stock is executory, and the purchaser merely has a right of completing his purchase by paying the price, a receiver appointed for the purchaser cannot obtain possession and title to the stock without first paying the purchase price, since a receiver takes no greater title to or right in property than the owner had prior to the receivership.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 124, 125; Dec. Dig. 69.]

2. CORPORATIONS 143—STOCK—TRANSFER—EFFECT.

The transfer of the capital stock of a railroad does not operate ipso facto as a transfer of the physical properties thereof.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 529, 532, 534, 536; Dec. Dig. 143.]

3. BANKS AND BANKING 94 — POWERS — DISPOSITION OF CORPORATE STOCK.

While a bank ordinarily may not own a railroad, it may sell and dispose of its capital stock held by it as executor.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 227; Dec. Dig. 94.]

4. MINES AND MINERALS 105 — MINING CORPORATIONS — POWERS — OPERATION OF RAILROADS.

Rev. St. 1911, tit. 25, c. 2, art. 1121, subd. 16, as amended by Acts 34th Leg. c. 144, giving private corporations power to contract for the lease and purchase of the right to prospect for, develop, and use gas, also erect, build, and own all necessary oil tanks, cars, and pipes necessary for the operation of the business of same, does not authorize a producing oil company organized under the laws of a foreign state to own and operate a railroad, although such railroad may be used in connection with its business.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 229, 229½; Dec. Dig. 105.]

---

5. RECEIVERS ⪦69—POWERS—POSSESSION OF PROPERTY.

A receiver for a corporation cannot compel a vendor under an executory contract with the corporation for the sale of lands to give title and possession thereof, without the prior payment of the purchase price, where the contract so provides, and where the company had no such right.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 124, 125; Dec. Dig. ⪦69.]

6. RECEIVERS ⪦32—APPOINTMENT—GROUNDS.

A bill for the appointment of a receiver which alleges that the company is insolvent, but can make payment if it is allowed time, states no ground for the appointment of a receiver, since to do so would be equivalent to declaring a moratorium by judicial decision.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 45–50, 64; Dec. Dig. ⪦32.]

7. RECEIVERS ⪦3—APPOINTMENT—GROUNDS.

A bill which has for its sole object the appointment of a receiver will not be entertained; a receivership being ancillary to the main suit wherein a cause of action exists, and which must be asserted independently of the right to a receivership.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 3; Dec. Dig. ⪦3.]

8. CORPORATIONS ⪦553 — APPOINTMENT OF RECEIVER—GROUNDS.

The mere fact that a corporation is insolvent is not sufficient ground for the appointment of a receiver therefor, without a showing of some equity in favor of complainants.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2201–2216; Dec. Dig. ⪦553.]

9. CORPORATIONS ⪦553 — APPOINTMENT OF RECEIVER—GROUNDS.

The fact that the creditor of a corporation attempts to assert an unjust debt and to charge usury does not justify the appointment of a receiver, since ample protection may be afforded by injunction.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2201–2216; Dec. Dig. ⪦553.]

Appeal from District Court, McMullen County; F. G. Chambliss, Judge.

Suit by Mrs. M. C. Brown and others against the Continental Trust Company and others. From two orders relating to the control of complainants' property by a receiver, in two cases tried together, defendants appeal. Reversed, and orders appointing receiver vacated.

McFarland & Lewright, of San Antonio, Beasley & Beasley and J. E. Daugherty, all of Beeville, and Lane, Wolters & Storey, and Paul Kayser, all of Houston, for appellants. A. J. Bell, W. W. Walling, Cobbs, Eskridge & Cobbs, and H. C. King, Jr., all of San Antonio, for appellees.

CARL, J. Appellees, Mrs. M. C. Brown, S. A. Hopkins, and the Boston & Texas Corporation, a South Dakota corporation, brought this suit in the district court of McMullen county against the Continental Trust Company, J. F. Saddler, Lee C. Ayars, the Guarantee Life Insurance Company, R. H. Brown, West Texas Bank & Trust Company, executor of the estate of C. F. Simmons, deceased; also against Kirby Lumber Company and one A. Van Dressar. The petition, among other things, prayed for an injunction to restrain a sale of certain real estate alleged to belong to the Boston & Texas Corporation, under an order of sale issued out of the district court of McMullen county on a certain foreclosure judgment in favor of R. H. Brown and to restrain Lee C. Ayars, trustee in a deed of trust for the benefit of the Continental Trust Company, from selling about 7,000 acres of land in McMullen county by virtue of the powers conferred upon him in said deed of trust, which was given to secure the payment of a series of notes, all of which will more fully appear in the further statement of this case.

It is alleged that the Boston & Texas Corporation owned 7,000 acres of land in McMullen county and an oil lease on about 1,100 acres of land adjoining the 7,000-acre tract, and that this corporation owned another tract of land adjoining the first two, of about 11,360 acres, which was purchased by S. A. Hopkins from R. H. Brown. The allegation is that Hopkins, while he took this conveyance in his own name, in fact, bought and held it for the Boston & Texas Corporation, and he asked that title thereto be decreed out of him and into said corporation, subject to the payment of the vendor's lien notes upon which R. H. Brown foreclosed. It is further alleged that Hopkins has a contract to purchase the capital stock of the Artesian Belt Railroad, and that this contract is also for the use and benefit of the Boston & Texas Corporation, and Hopkins also asks that his rights under this contract of purchase be decreed to be in the Boston & Texas Corporation.

The Artesian Belt Railroad matter came about in this manner: H. E. Hildebrand, who has intervened in this suit, made a contract with the West Texas Bank & Trust Company, executor of the estate of C. F. Simmons, deceased, under order and approval of the probate court of Bexar county, whereby he agreed to purchase the capital stock of the Artesian Belt Railroad for the sum of $200,000, the sum of $25,000 having been paid in cash, and the remainder was on deferred payments, the bank, as such executor, holding the stock to secure the balance of the purchase money, amounting to $175,000. This contract was sold by Hildebrand to Hopkins, as the latter and the Boston & Texas Corporation allege, for the use and benefit of this corporation; and Hopkins says he is willing that such purpose be made effective and consummated by the court decreeing his interest therein and thereunder to said corporation, subject to the payment of the balance of the purchase money.

The petition shows that the Boston & Texas Corporation is incorporated for $300,000; that complainant M. C. Brown owns one share of the stock, and S. A. Hopkins

owns $164,000; that in 1911, 1912, and 1913 the Boston & Texas Corporation made, executed, and delivered to M. C. Brown, complainant, as trustee for the benefit of the King-Crowther Corporation, promissory notes aggregating $42,384.90, which notes were payable on demand to the said M. C. Brown, and, in addition, the Boston & Texas Corporation owes said M. C. Brown, as trustee for the King-Crowther Corporation, on open account, the sum of $56,500, for money advanced during the years 1913 and 1914; that the King-Crowther Corporation was chartered under the laws of the state of Maine; the notes bear 7 per cent. interest; that $25,000 of the money so borrowed by the Boston & Texas Corporation was used for the purchase of material, etc., that went into the construction of an extension of the Artesian Belt Railroad from the town of Christine, the terminus of the railroad, to Crowther, such money being so advanced upon the distinct understanding that the Artesian Belt Railroad was not to be responsible for any portion of said money so expended, and the King-Crowther Corporation expressly waived a lien on the railroad when the money was advanced. And it is claimed that said money is owing to the King-Crowther Corporation by the Boston & Texas Corporation.

The petition charges that the Boston & Texas Corporation was chartered for the purpose of owning and developing real estate for mineral purposes and for boring and drilling for oil, coal, kaolin, and other minerals, and for such other purposes as are germane and incident thereto; that on 1,100 acres leased the Boston & Texas Corporation has about 23 oil wells, all of which under proper care and attention would produce a large quantity of valuable lubricating oil; that on the 11,360 acre tract there is about 3,000 acres of proven oil land, the value of which, under proper development, would be materially increased; and that on the 7,000 acre tract there is about 4,000 acres of proven oil land. And it is alleged that the Boston & Texas Company has expended about $400,000 in developing said oil field. It is further contended that these fertile oil fields are so remotely situated from railroad facilities that it is necessary to a full enjoyment of their hidden treasures that the Artesian Belt Railroad be extended into them, or to the thriving city of Crowther, in the midst of them, but that about one year before the suit was filed the West Texas Bank & Trust Company took said railroad away from H. E. Hildebrand, since which time the bank has been operating same through a manager, when Hopkins and Hildebrand are entitled to enjoy the luxuries of running the same; and, further, unmindful of the fact that the West Texas Bank, as executor, had taken said railroad out of the hands of Hildebrand and Hopkins, and was so operating said road, this bank has sued Hildebrand and Hopkins and E. O. Burton, R. R. Russell, and Emma Smith as sureties on a certain bond, and to foreclose for about $225,000 on the stock of the artesian Belt Railroad.

The petition also sets out that about January 23, 1912, the Boston & Texas Corporation executed and delivered to Lee C. Ayars a deed of trust on the 7,000 acres of land to secure the payment of thirty-four notes for the sum of $5,000 each, or a total of $170,000; twenty-six of which notes being payable to the order of the Continental Trust Company five years from their date, containing the customary default clauses in regard to the failure to pay interest, and the 10 per cent. attorney's fee clause, all payable at Houston, Tex., and eight notes for $5,000 each, payable to the order of the maker, which said last notes were indorsed by said Boston Corporation, and delivered over to the Continental Trust Company. They were also indorsed in blank by S. A. Hopkins. These eight notes were payable three years from their date. These last notes, representing $40,000, it is charged, were given as a bonus for the $130,000, which the Boston & Texas Corporation really expected to obtain in said loan. But it is charged that only about $64,700 was actually furnished the Boston Company by the Continental Trust Company, and that, if the remaining $65,000 had been furnished as per agreement, the section of the road from Christine to Crowther could and would have been completed, thereby greatly enhancing the value of the oil land to such an extent that a large part of the land would have been worth $1,000 per acre, and the other lands would be worth from $25 to $70 per acre; and if these things had all happened, the Boston & Texas Corporation would have been able to pay out and then have money. But they charge that the Continental Trust Company refused to furnish any more money after it had furnished the $65,700. The 7,000 acres of land was the only land or property which the Boston & Texas Corporation had which was clear of liens, and, when it was mortgaged to secure the loan from the trust company, it could not get any more money with which to complete said railroad, and by the breach of its contract the trust company has prevented the completion of the railroad. The eight bonus notes above referred to are charged to be usury, and prayer is made that they be canceled.

The petition further states that, in addition to the $65,000 advanced, the Continental Trust Company guaranteed the payment of about $22,000 to the Kirby Lumber Company for ties and bridge material, but have refused to pay for same, and the lumber company has filed suit in the district court of Harris county against the Boston & Texas Corporation and Hopkins, which suit has embarrassed the defendants therein in developing their plans and in procuring finan-

cial aid. When Hopkins bought the 11,360 acres of land, he gave in part payment six notes for $13,000 each, and these are the notes R. H. Brown declared due and obtained judgment on, mentioned above in this opinion. In the suit filed in Houston on the notes given the Continental Trust Company the petition names the Guarantee Life Insurance Company and James F. Saddler, Jr., as plaintiffs, but it is alleged here that, if those parties bought said notes, they did so with full notice of all the vice contained in the whole transaction. Further, in reference to the stock purchase of the Artesian Belt Railroad, it is alleged that, if complainants had obtained the same, they could have secured $700,000 in bonds against said railroad, out of which they could have paid for the said stock, all of which was prevented by the failure of the trust company to furnish the balance of the money contracted to be furnished.

December 17, 1914, S. A. Hopkins gave a deed of trust on the Brown land to secure a large sum of money due the State Bank & Trust Company, and it is claimed that the bank or J. H. Haile was a necessary party to Brown's foreclosure suit; and that bank has filed suit to set aside and reopen said suit in which Brown foreclosed his vendor's lien and obtained a judgment for approximately $94,000 against Hopkins and the Boston & Texas Corporation.

The Boston & Texas Corporation owes about $650,000 including the claims set forth, but claims that it can pay out if it can get time to realize on its assets, which can be done by building said railroad, through loans it hopes to make, and if the Mexican and European wars do not last too long; but it says that it cannot pay said debts now on account of the financial stringency. Therefore it says it is insolvent and on account of the matters related its property and assets are in imminent peril of being dissipated. Therefore a receiver is prayed for to take charge of all the assets of the Boston & Texas Corporation, including the Artesian Belt Railroad, its stock and physical properties, as well as the lands mentioned, and for injunction to restrain the sale of or interference with any of said property, except under order of the court after application is made therefor.

The Continental Trust Company denied all the material allegations, and especially that it was insolvent, and that the eight notes were an usurious charge against the Boston & Texas Corporation, and tendered same up to be canceled.

The court issued the temporary injunction prayed for, and set the hearing for receiver for May 28, 1915, at Floresville. The defendants answered, and all demurred generally to the sufficiency of the application, denied the material allegations, and made special pleas, the nature of which will appear in the

further discussion of this case. At the hearing J. O. Terrell was appointed receiver— "of all the properties, rights, and franchises of the Boston & Texas Corporation and of the properties held by S. A. Hopkins as alleged in his petition for said company, including the tract of 11,360 acres described in the pleading and known as the Brown land, of every kind and character and description whatsoever and wheresoever situated, including the cars, locomotives, tools, machinery, movable effects, books, books of accounts, records, cash on hand and in banks, all rents, profits, issues, tolls, revenues, and income of the Artesian Belt Railroad, in equity, real or otherwise, wheresoever situated, whatsoever the said Boston & Texas Corporation, and to use the same and run and operate the same, and continue the operation and business thereof as a going concern, and to transact the business of said companies," etc.

The ordinary powers of a receiver are conferred in said order, and all parties are restrained from taking any further action in regard to said properties, except through the court appointing the receiver. The receiver was placed under a $5,000 bond which he gave; but the order making such appointment contains this clause:

"It is further understood herein that the receiver at this time shall not take possession of or exercise control over the properties or capital stock of the Artesian Belt Railroad Company until further authorized by further order of this court."

This order was excepted to, and notice of appeal given, and is the order from which this appeal is perfected; and on July 10, 1915, the court entered an order directing the receiver to take charge of all the properties, and this order was appealed from. So the two cases stand upon our docket as No. 5553 and No. 5586, and will be treated both together in this opinion.

Hildebrand and the State Bank & Trust Company and J. H. Haile, as interveners, joined in the prayer for a receiver. No one asked for the dissolution of the Boston & Texas Corporation and that its affairs be wound up.

The pleadings in this case embrace 232 pages of the transcript, and, if we have been too brief in our statement, it is because of our desire to condense as much as we could, and yet omit nothing material.

First, let us analyze the issues and see just what is presented from a legal standpoint. Assuming the facts as pleaded, we find that S. A. Hopkins had a contract to purchase, through transfer from Hildebrand, the capital stock of the Artesian Belt Railroad; that $175,000 of the purchase price had not been paid, and the West Texas Bank & Trust Company, as executor of the estate of C. F. Simmons, deceased, held that stock as security until that debt was paid. It is true that all of that stock except eight shares was held by the San Antonio Loan & Trust Company to secure a debt C. F. Simmons owed his former wife, but that is a matter of no consequence, because it would not change the legal title to the stock.

[1] This contract for the railroad stock

is executory, because the purchase price had not been paid, and the stock was not, and would not be, delivered until that sum was paid. Hopkins alleges that, while he made the contract of purchase for the stock in his own name, it was, in fact, made for the Boston & Texas Corporation. He claims no rights in it personally, and asks that same be decreed to the corporation. Since this stock contract is executory, whether it be Hildebrand, Hopkins, or the Boston & Texas Corporation, they neither had the legal title to the property, but only the right to complete the purchase by paying the price and then obtain a title. It is not different from a man who buys land, and the vendor's lien and superior title are reserved until the balance of the purchase money is paid. The title there remains in the seller; the purchaser only having the right to complete the purchase and obtain a title by paying the price. It would be a monstrous proposition of law if the purchaser of this stock could demand and receive the stock without first paying for same. And here payment of the $175,000 is not even tendered; but it is proposed to do, through a receiver, what no one would contend that Hopkins or Hildebrand would have the right to do as individuals, namely, get possession of the stock without first paying for it. A receiver takes no greater title to or right in property than the owner had prior to the receivership. The appointment of a receiver does not do away with rights fixed by contract, and the very same contract under which right to the stock is here asserted provides that the executor should hold same until the purchase money should be paid.

[2] But it is asserted that under the contract of purchase of the railroad stock by Hildebrand, under order of the probate court of Bexar county, the physical properties of the railroad were to pass. To this we need only say that the probate court could only authorize the sale of the stock, because that is what C. F. Simmons owned. The fact that the stock represented practically the road—certainly the control—would not alter the situation. The road itself is controlled by a board of directors.

[3] We are told that, if the West Texas Bank & Trust Company could operate a railroad, then there is no reason why the Boston & Texas Corporation could not do the same; if one corporation could do it, another could. The bank, under its rights to act in a trust capacity, was acting as executor, and naturally voted the stock in the selection of directors who operated the road. Ordinarily, a bank probably could not own a railroad, but the handling of the stock as executor is quite a different matter.

[4] It is contended that the Boston & Texas Corporation could own the railroad, because, under an amendment, as passed by the Thirty-Fourth Legislature (General Laws, p. 225), it is provided:

"That article 1121, subdivision 16 of title 25, chapter II, of the Revised Statutes of the state of Texas, 1911, be amended so as to hereafter read as follows:

" 'For the establishment and maintenance of oil companies with the authority to contract for the lease and purchase of the right to prospect for, develop and use coal and other minerals, petroleum and gas; also the right to erect, build and own all necessary oil tanks, cars and pipes necessary for the operation of the business of same.'

"All private corporations heretofore created under the provisions of subdivision 16, article 1121, chapter II, title 25, Revised Statutes of Texas of 1911, shall, in addition to the powers therein enumerated, have the power to contract for the lease and purchase of the right to prospect for, develop and use gas; also erect, build and own all necessary oil tanks, cars and pipes necessary for the operation of the business of same."

This contention is made because of the provision that, among other things, they may own tank cars, ships, etc. And it is a matter of common knowledge that oil companies do own and operate tank cars; but that is a very different matter from owning and operating a railroad. Nearly every circus owns its private cars, but we have never known of a circus owning a railroad, nor do we believe that the mere fact that they own cars would give them the right to own a railroad.

The Boston & Texas Corporation is a producing oil company, organized under the laws of a foreign state, and is not a pipe line company; so that, when it comes into this state to do business under a permit, it could have no greater powers than is permitted to similar corporations under subdivision 16 of article 1121 of the Revised Statutes of this state. And the most liberal construction of this statute would not give this oil company the right to own this railroad, even if its contention be granted that the contract intended to convey the physical properties of the Artesian Belt Railroad; and if the corporation could not own the road, it could not do through a receiver what it could not do acting for itself under its own board of directors. So the railroad matter furnishes no ground for a receiver.

[5] And when we come to consider the 11,360 acres of land known as the Brown land, we find that this is also a purely executory contract for the sale of the land, because the vendor's lien and superior title were reserved until the notes, upon which foreclosure was obtained, should be paid. It has long been held in Texas that such a sale leaves the title in the vendor, and what the purchaser has in such case is the right to pay the debt and secure a title. Neither Hopkins nor the Boston & Texas Corporation had more than a right to pay for said land and thereby obtain a title. A receiver would have no greater right, and we find that no tender of the purchase money is made. On the contrary, that is precisely

what they are seeking to avoid. This land was constructively in the hands of the sheriff, who had seized the same under an order of sale, based on the foreclosure judgment, and neither Hopkins nor his corporation could take it away from him without paying that debt, and they did not need a receiver to do this.

[6] The fact of the business is this whole proceeding appears to be based upon the idea of gaining a little time until the hard times pass; for the applicants say in their bill:

"Complainants believe that this court should take judicial knowledge of the present financial condition now prevailing throughout this country on account of the Mexican war and great European war, that is now being felt in the whole financial world, and stay the hand that would take from the unfortunate debtor who is struggling to meet his obligations, as these complainants are, and even now at great sacrifice complainants are negotiating and have contracts which, if consummated, will enable them to pay all creditors who are pressing them. What these complainants most value, next to eternity, is a little time, and this they pray through the equity powers of this court. Poverty wants some things; luxury many; avarice all things. These complainants, though poor, want a little time; these creditors want all, that they may live in luxury; but this court has the equity power to stay their hands, and it is prayed."

We cannot but commend the candor of this fervent prayer of the able counsel, but at the same time it reminds us of that honest old lawyer who, in having his client swear to an application for a continuance, said:

"This application is not made for delay, but to gain time."

Hard times is not recognized in law as a ground for a receiver, nor had we ever supposed that a receiver was a panacea for the ills of a time of financial stringency. Indeed, if we were so to treat the matter, it would be equivalent to declaring a moratorium by judicial decision—a thing the Legislature of this state expressly declined to do.

[7] Hildebrand and Hopkins are not suing the Boston & Texas Corporation, except that they ask for a receiver. So, as to them, it is purely a suit for a receiver, and the courts of this state, as well as all other recognized authorities, have uniformly held that a bill which has for its sole object the appointment of a receiver will not be entertained. This court has only recently so held in an opinion written by its Chief Justice. Toomey v. First Mortgage Trust Co., 177 S. W. 539. A receivership is ancillary to the main suit where a cause of action exists and is assert-ed independent of such receivership, and the corporation, as such, has no right to ask for a receiver for itself.

[8] If it be conceded that this corporation is insolvent, that is not sufficient ground for the appointment of a receiver, without a showing of some equity in favor of the plaintiffs. First lien creditors will not be hindered or delayed in the collection of their debts, except upon a clear showing of some threatened illegal waste or destruction of the property, and that protection may be obtained by an injunction. It is urged that the wars in Mexico and in Europe have made it difficult to finance this undertaking, and if the court will appoint a receiver and build the railroad into these oil fields, the corporation will be able to realize large sums for its lands, and can pay out. As to how long these wars will last is not stated in the bill, and as to developing an oil field, this court knows of no more uncertain or speculative proposition. The bill admits that the parties themselves have been unable to carry through their plans successfully, and it is not made to appear how the receiver could do that which they have failed to do, unless it be that he could get possession of the railroad stock and land without paying what is admitted to be the purchase price. But we have seen that the receiver would have no greater rights than the parties themselves would have.

[9] As to the controversy with the Continental Trust Company, no ground for a receiver is there shown, because, if their debt is not just, and usury has been charged, the court could render ample protection against the sale by its injunction powers. The petition or bill shows that the trust company is a first lienholder on 7,000 acres of land owned by the Boston & Texas Corporation, but we are unable to see how the relief sought against the trust company demands the appointment of a receiver for the one seeking that relief.

We therefore conclude that the trial court was in error in appointing the receiver, and also in thereafter making an order placing him in charge of the properties.

So the judgments in causes No. 5553 and No. 5586 are reversed, and the orders appointing a receiver and placing him in charge are vacated, together with all other orders in connection with the receivership, and the receiver is discharged. The clerk of this court will accordingly so certify.